James H. Power
Marie E. Larsen
HOLLAND & KNIGHT LLP
31 West 52nd Street
New York, New York 10019
Telephone: 212-513-3200
Telefax: 212-385-9010
Email: james.power@hklaw.com
      marie.larsen@hklaw.com

*Attorneys for Plaintiff*
*Star Tankers Inc*





UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

STAR TANKERS INC, individually and on behalf of
M/V SHARON SEA (IMO No. 9316232),

                                        Plaintiff.

- against -

O.W. BUNKER PANAMA S.A., O.W. BUNKER
USA INC, O.W. BUNKER NORTH AMERICA INC,
O.W. BUNKER HOLDING NORTH AMERICA
INC, ING BANK N.V

                                        Defendants.

---

15 Civ. _____ (    )

**COMPLAINT**
**FOR INTERPLEADER**

Plaintiff Star Tankers Inc ("Star Tankers" or "Plaintiff"), by and through its attorneys

Holland & Knight LLP, bring this action pursuant to Rule 9(h), as and for their Complaint for

Interpleader pursuant to 28 U.S.C. §§ 1335(a) and 2361 and alleges, upon information and belief,

as follows:

## THE PARTIES

1.      Star Tankers is a corporation or business entity organized and existing pursuant to the laws of Delaware, with an office and place of business at 20 Glover Avenue, Norwalk, CT 06482.

2.      Defendant O.W. Bunker Panama S.A. ("O.W. Panama") is a corporation or business entity organized and existing pursuant to the laws of a foreign country, with an office and place of business at 5282 Calle Luis Urriola, Diablo Heights, Ancon, Panama.

3.      Defendant O.W. Bunker USA Inc. ("O.W. USA") is a corporation or business entity organized and existing pursuant to the laws of Texas the with its principal place of business at 2603 August Drive, Suite 440, Houston, TX 77057.

4.      Defendant O.W. Bunker North America Inc. ("O.W. North America") is a corporation or business entity organized and existing pursuant to the laws of Connecticut, with an office and place of business at 281 Tresser Blvd., 2 Stamford Plaza, 15th Floor, Stamford, CT 06901.

5.      Defendant O.W. Bunker Holding North America Inc. ("O.W. Holding") is a corporation or business entity organized and existing pursuant to the laws of Connecticut, with an office and place of business at 281 Tresser Blvd., 2 Stamford Plaza, 15th Floor, Stamford, CT 06901.

6.      Defendant ING Bank N.V. ("ING") is a bank organized and existing pursuant to the laws of the Netherlands with an office and place of business located at Amsterdamse Poort, Bijlmerplein 888, 1102 MG Amsterdam, The Netherlands.

## JURISDICTION AND VENUE

7.    This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1333 and Fed. R. Civ. P. 9(h),  inasmuch as it involves the interpleader of funds in the possession of Star Tankers for the payment pursuant to a bunker supply contract for the provision of necessaries (i.e., fuel oil or bunkers) to the vessel M/V Sharon Sea (IMO No. 9316232) (the "Vessel").

8.    This Court has original jurisdiction over this interpleader action pursuant to 28 U.S.C. § 1335(a) in that for the bunker payment in question: (a) at least two of the claimants are of diverse citizenship; (b) the disputes between the claimants each involve funds in an amount exceeding $500.00, exclusive of interest and costs; and (c) Plaintiff, on behalf of the Vessel is the stakeholder of the funds and, concurrently with the filing of this Complaint, will seek to make a deposit in the Court's Registry in the principal sum of at least $344,408.43, which is the amount due for the fuel delivery to the Vessel on October 24, 2014.  Additionally. Star Tankers will seek to deposit an interest component of 6% to the principal sum in the amount of $20,664.50 for a total deposit of $365,072.93.

9.    This Court has personal jurisdiction over defendants O.W. Panama. O.W. USA, O.W. North America and O.W. Holding pursuant to the terms of the applicable bunker supply contract and O.W. Group Standard Terms and Conditions.

10.    This Court also has personal jurisdiction over defendants O.W. USA, O.W. North America, and O.W. Holding pursuant to 28 U.S.C. § 2361.

11.    Upon information and belief, the Legal Representative of O.W. Panama, Adrian Tolson, is located in this District and service upon Mr. Tolson could be effected pursuant to 28 U.S.C. § 2361.

12.     This Court has personal jurisdiction over ING to the extent it is or may be a third-party beneficiary of the bunker supply contracts at issue in this dispute and to the extent that it is an alleged assignee of the receivables of O.W. USA, O.W. North America or O.W. Holding. Additionally, ING transacts business within the jurisdiction of this Court and has a place of business at 1325 Avenue of the Americas, New York, New York 10019.

13.     Venue is properly laid in this Court pursuant to 28 U.S.C. § 1397.

## NATURE OF ACTION

14.     This is an action for interpleader with respect to the principal sum of $334,408.43, representing the amount due for the supply of bunkers to the Vessel.  With respect to payment for such supply, O.W. Panama, O.W. USA, O.W. North America, O.W. Holding, ING or some other third party have or may have conflicting claims as to ownership of the fuel payment funds owed by Star Tankers for the purchase of and  receipt of a specific and finite quantity of bunkers (fuel) at Galveston Offshore Lightering Area, located offshore Texas by the Vessel (the "Fuel Delivery").

## FACTUAL BACKGROUND

15.     Star Tankers is the time charterer and vessel pool manager of M/V Sharon Sea.

16.     On or about October 22, 2014, Star Tankers ordered bunkers to be loaded onboard and consumed by the vessel M/V Sharon Sea.  A true and correct copy of the Sales Order Confirmation received from O.W. Panama is attached hereto as Exhibit 1.  On this document, the "supplier" is identified as O.W. Bunker Panama.

17.     The bunkers were delivered to the vessel Sharon Sea on October 24, 2014.  A bunker delivery note was issued by O.W. Panama.  A true copy of the bunker delivery receipt is attached hereto as Exhibit 2.

18.     An invoice was issued to Star Tankers on October 24, 2014 for the supply of bunkers to Sharon Sea.  The invoice includes an internal accounting reference by O.W. Bunker to Ann Vestergaard, an employee of O.W. North America.  The invoice directs payment of $344,408.83 to O.W. Panama, to an ING account.  A true copy of the bunker invoice is attached hereto as Exhibit 3.

19.     The standard terms and conditions of all OW Bunker entities for the sale of bunkers includes clause P.5: "Without prejudice to any other Clause herein any disputes and/or claims arising in connection with these conditions and/or any Agreement governed by them, any dispute and/or claim aris[ing] in connection with a Vessel detained by Seller at any port, place or anchorage within the United States shall be submitted to the United States District Court for the Southern District of New York."  A true copy of the OW Bunker terms is attached hereto as Exhibit 4.

20.     On November 7. 2014, O.W. Bunker & Trading A/S and certain of its Danish subsidiaries and affiliates filed for bankruptcy in their home jurisdiction of Denmark.  Thereafter many other O.W. entities and/or affiliates filed for bankruptcy in various other jurisdictions around the world.  No foreign O.W. bankruptcy proceeding has been recognized in the United States pursuant to Chapter 15 of the U.S. Bankruptcy Code.

21.     On or about November 13, 2014, OW USA, OW North America and OW Holding (collectively, the "Debtors") all filed voluntary petitions pursuant to Chapter 11 in the United States Bankruptcy Court for the District of Connecticut as Case Nos. 14-51720, 14-51721 and 14-51722.

22.     Pursuant to an Omnibus Security Agreement dated December 19, 2013 between O.W. Bunker & Trading A/S and its subsidiaries (believed to include O.W. USA, O.W. North

America and O.W. Holding), and ING as Security Agent, the O.W. entities have allegedly assigned certain rights in respect of their supply contracts as security to ING.

23.     On March 18, 2014, in advance of the Vessel's imminent scheduled arrival in Panama, an arrest friendly jurisdiction, Star Tankers received an email from O.W Panama through its Panamanian counsel, Francisco Carreira, at Carreira Pitti Attorneys.  A true copy of the email is attached as Exhibit 5.  In the email Mr. Carreira stated that he has been instructed to arrest the vessel M/V Sharon Sea on behalf of O.W. Panama.  In a follow up email, Mr. Carreira provided payment instructions differing from those on the original invoice from O.W. Panama.  By telephone Mr. Carreira also indicated that O.W. Panama had assigned its rights to third parties.  Upon Plaintiff's request for confirmation as to Mr. Carreira's authority to collect payment on behalf of O.W. Panama and explanation of the change in payment instructions and the rights of third party assignees, counsel for O.W. Panama merely reiterated its intention to arrest the Vessel if prompt payment was not made.  See Exhibit 5.

24.     On March 19, 2014, Star Tankers received an email from the O.W. Debtor's counsel indicating that they have potential claims against the Sharon Sea for the Fuel Delivery on October 24, 2014 and would not object to this interpleader or the deposit of funds with this Court.  A true copy of the email is attached as Exhibit 6.

### POSSIBLE ARREST OF VESSEL AND NECESSITY OF INTERPLEADER

25.     Due to the bankruptcy filings of O.W. Denmark and other O.W. group entities, O.W. Panama, O.W. USA, O.W. North America and O.W. Holding and ING have sought or are expected to seek to collect amounts allegedly owed to them arising from or related to the supply of bunkers to the Vessel.

26.     Under United States maritime law, the contract supplier (such as O.W. Panama) of necessaries, including fuel, to a vessel obtains a maritime lien against that vessel. Additionally, under certain circumstances, a physical supplier (or transporter) of the fuel  may also assert a maritime lien on that vessel.

27.     Moreover, other parties, such as ING, have asserted a right to payment for the Fuel Delivery.   Upon information and belief ING's claims are based on assignments of receivables by various O.W. entities including but not limited to O.W. USA, O.W. North America and O.W. Holding

28      The Vessel is due to call at various ports in the United States and Panama and will face arrest by the defendants claiming to assert a maritime lien,[1] which would cause harm to Plaintiff, delay the Vessel, affect innocent third parties with interests in the Vessel's cargo and generally inhibit and interfere with maritime commerce

29      Star Tankers presently has control over the funds invoiced for the Fuel Delivery to the Vessel  Plaintiff disclaims any interest in the amount invoiced for the supply of bunkers to the Vessel

30      Star Tankers cannot ascertain whether the amount owed for the Fuel Delivery should be paid to O W  Panama, O W  USA, O W  North America, O W  Holding or ING or some other third party which may have a right to the O W  Panama receivables in order to extinguish all maritime liens and/or other claims against Star Tankers and the Vessel and to prevent the Vessel's arrest or attachment in this District or elsewhere and to prevent double liability for the Fuel Delivery

---

[1] Plaintiff makes no assertion nor take a position as to the validity of any of the potentially asserted maritime lien  or other claims by any of the Defendants or whether O W  USA, O W  North America, O W  Holding has validly assigned any maritime lien or other claims to ING  These issues  remain to be decided

31.    The competing claims of the Defendants or other third parties will likely expose Star Tankers and the Vessel to multiple liabilities in connection with the payment of the bunker invoices in order to extinguish competing maritime lien claims and/or other *in personam* or non-maritime claims.

32.    Star Tankers, acting on behalf of the Vessel, is entitled to deposit with the Court the sum of at least $334,408.43, representing the amount due pursuant to the invoice issued by O.W. Panama for the Fuel Delivery, and require that O.W. Panama, O.W. USA, O.W. North America, O.W. Holding, ING and any other claimant interplead among themselves to establish their respective rights to the funds.

33.    Further, in order to comply with the requirements of Supplemental Admiralty Rule E(5)(a) and for the funds deposited into the registry to constitute security for the *in rem* claims of the claimants and to act as the substitute *res* against which claimants must assert their maritime liens for the Fuel Delivery. Plaintiff is prepared to deposit an additional amount ($20,664.50) constituting 6% interest per annum or such other amount as the court deems just and proper.  Thus, the total amount of the proposed deposit is calculated to be $365,072.93, inclusive of one year of interest.

34.    After depositing the sum of $365,072.93 with the Court, Star Tankers is entitled to be discharged from further *in personam* liability with respect to the funds and liability for payment for the Fuel Delivery.  The Vessel is similarly entitled to be discharged from any maritime lien against it arising from the Fuel Delivery as described herein and as reflected in Exhibits 1 - 3.

WHEREFORE, Plaintiff Star Tankers Inc, individually and on behalf of the vessel M/V Sharon Sea, respectfully requests that this Court:

(i)     determine which of the defendants is entitled to the Fuel Delivery funds, or, in the alternative, the share of each defendant, if any;

(ii)     enjoin O.W. Bunker Panama S.A., O.W. USA Inc, O.W. North America Inc., O.W. Bunker Holding North America Inc., ING Bank, N.V. and any later-identified claimants from commencing any action against Star Tankers Inc or the vessel M/V Sharon Sea *in rem*, including but not limited to the arrest or attachment of the Vessel in any port, pursuant to Supplemental Admiralty Rules C or B based on the assertion of any *in rem* claim or *in personam* claim directed against Star Tankers Inc for the provisions of the bunkers referred to herein as the Fuel Delivery;

(iii)     discharge Star Tankers Inc from any liability on any claim that has been made or may in the future for the Fuel Delivery upon Plaintiff's deposit of $365,072.93 into this Court's registry, or such other amount the Court finds sufficient to discharge Star Tankers and the Vessel from liability for the Fuel Delivery;

(iv)     discharge the Vessel from any liability on any claim that has been made or may in the future be made for the Fuel Delivery upon Plaintiff's deposit of $365,072.93 into this Court's registry;

(vi)     award Plaintiff its costs and attorneys' fees in bringing this action and in maintaining this action if claimants unreasonably object; and

(vii)     award the return of any amount remaining in the registry (e.g., the interest deposit) to the Plaintiff upon the ultimate disposition of claims to the deposited Fuel Delivery funds; and

(viii)     award Plaintiff such other and further relief including equitable relief available under admiralty which this Court may deem just and proper.

Dated:  New York, New York
        March 19, 2015

HOLLAND & KNIGHT LLP

By: _____
James H. Power
Marie E. Larsen
31 West 52nd Street
New York, New York 10019
Telephone:  212-513-3200
Telefax: 212-385-9010
Email:  james.power@hklaw.com
         marie.larsen@hklaw.com

*Attorneys for Plaintiff Star Tankers Inc.
individually and on behalf of
M/V SHARON SEA (IMO No. 9316232)*

34515620v3

# EXHIBIT 1

*STAR14223*

## O.W. Bunker Panama, S.A.
RUC: 1514888-1-650354 DV 6





Star Tankers Inc
20 Glover Avenue
USA-CT 06482 Norwalk
United States of America
Mr Kyle Young

Albrook Office Center, 5th Fl  Suite #17
Diego Dominguez Street Ancon
Panama
Tel  + 507 232 0219
 Fax  + 507 232 0387
Email  panama@owbunker com
Reg: 1514888-1-650354
ING Bank N V
IBAN: NL26 INGB 0020 1180 31
IBAN: NL10 INGB 0651 3696 81
SWIFT  INGBNL2A
IBAN  NL26 INGB 0020 1180 31
SWIFT  INGBNL2A

## Sales Order Confirmation

Sales Order No.        183-11596

We are hereby pleased to acknowledge receipt of your order as follows

Panama  22 October 2014

| | |
|---|---|
| Vessel | SHARON SEA (IMO  9316232) |
| Port | GALVESTON LIGHT  AREA |
| Delivery date | 23 October 2014 |
| Seller | O W  Bunker Panama |
| Your ref. | |
| Account | MASTER AND/OR OWNER AND/OR CHARTERERS AND/OR MV SHARON SEA AND/OR STAR TANKERS INC |

| Quantity | Unit | Product / Quality | Curr | Price | Unit | Supplier |
|---|---|---|---|---|---|---|
| 450 00 | MT | Fue oil 380-CST 3 5% | USD | 466,00 | MT | O W  Bunker  Panama |
| 250 00 | MT | 380-CST 1% | USD | 535 00 | MT | O W  Bunker Panama |

| | |
|---|---|
| Agent | |
| Payment | WITHIN 30 DAYS FROM DATE OF DELIVERY UPON PRESENTATION OF INVOICE (ORIGINAL/TELEX/FAX)  COPY OF DELIVERY RECEIPT WILL BE FORWARDED WHEN WE HAVE RECEIVED SAME |
| Remarks | Up to six sample bottles will be landed for a charge of $500 |

A single paperwork envelope prepared by the vessel will be landed for $200  a second  envelope will be landed for an additional $100  More than two paperwork envelopes must be shipped in an OW box for disposition by the agent and will be charged a $500 box fee  for each box used

Delivery to take place @GOLA 28-40N 094-40W

## EXHIBIT 2

# O.W. Bunker Panama S.A.

5282 Calle Luis Urriola
Diablo Heights
Ancon
Panama



## Bunker delivery receipt  1395993

| | | | |
|---|---|---|---|
| Delivery date | 24-Oct-14 | Alongside | 09:24 |
| Receiving vessel | SHARON SEA | Hose connected | 10 12 |
| IMO number | 9316232 | Commenced pumping | 11.54 / 13 42 |
| Flag | LIBERIA | Completed pumping | 13·24 / 14 54 |
| Port/location | GOLA | Hose disconnected | 15:30 |
| Bound for | GOLA | Departure | 15:54 |
| Delivered by | ELISALEX SCHULTE | | |

| Description<br>Product delivered | Litres<br>Net @ 15°C | BBLS<br>Net | Metric tons in air<br>(3 decimal) | BBLS<br>Gross |
|---|---|---|---|---|
| HSRMG380 | 456347 | 2871.648 | 450.505 | 2966 213 |
| LSRMG380 | 256320 | 1612 988 | 250 417 | 1635 898 |

| | HSRMG380 | LSRMG380 | Fuel Oil | Gas Oil |
|---|---|---|---|---|
| Kinematic viscosity | 341 5 | 302 8 | | |
| Density in kg/m³ @ 15 °C | 987 9 | 978 2 | | |
| Water content | 0 10 | <0 05 | | |
| Sulphur content | 3 38 | 0 938 | | |
| Flash point °F | 169 9 | 202 1 | | |
| Pour point °F | 16 | 27 | | |
| API Gravity @ °F | 11 6 | 13 1 | | |
| Ash content | 0 066 | 0 032 | | |
| Delivered temperature | 55 | 53 | | |
| Sample seal numbers | | | | |
| Receiving vessel | 1395992 | 1395986 | | |
| Marpol sample | 1395991 | 1395987 | | |
| To Laboratory | | | | |
| Barge | 1395994 | 1395988 | | |
| Extra | | | | |

Remarks

Received the above in good condition
Also received two representative drip samples each grade collected from ship manifold whilst bunkering
Page 1 Administration  Page 2 Barge  Page 3 Receiving vessel  Page 4 Receiving vessel
Fuel oil supplied is in conformity with Marpol regulation 14(1) and 18(1) According to regulation 4(a) the sulphur
content of fuel oil used on board ships in a SOx emission control area must not exceed 1 0 % m/m

Supplier stamp and signature         Vessel's stamp         Signature chief engineer/Master

# **EXHIBIT 3**

STAR/4223

M V SHARON SI A IMO 9316232
AND OR OWNERS CHARTERERS

(W) **Bunker**

Star Tankers Inc
20 Glover Avenue
Norwalk, USA-CT 06482
United States
Kyle Young

DATE OF INVOICE : 24 October 2014
INVOICE NO      : 183-11668
ORDER NO           183-11596
ACCOUNT NO         13282
OUR REF            Ann Veste gaard
DATE OF SUPPLY   24 October 2014
DUE DATE         23 November 2014

PORT GALVESTON LIGHTERAREA
YOUR REFERENCE

| Quantity supplied | Quality description | Price per | Invoice amount |
|---|---|---|---|
| 150 505  MT | Unclon 380-CST 3 5% | 466 03  MT | 209 935 33 |
| 250 417  MT | 380-CST 1% | 535 00  MT | 133 973 10 |
| 1 000  LPS | Sample Handlingfee | 500 03  LPS | 500 00 |

Your VAT No                                  N  Amount    USD  344 408 43
Our VAT No   ES A883 163063               VAT Amount   USD    0 0
Taxable amount US  0 0 Vat amount USD   Amount incl VAT USD  totcal excl tax USD
VT 408 43   0 0              VT 408 43      0 0 0

The price invoiced includes all other fees

TERMS OF PAYMENT   days from date of invoice With due date   Due no 23 Day s     Inv

BANK          ING B nk N V

ACCOUNT       IBAN N 26 ING 0020 118031   USD and other currencies
              IBAN NL 10 ING 0651 090 81  EUR

              SWIFT INGBNL2A

O W BUNKER PANAMA S A
Vb ook Office Center St Fl  Suite # 7
ngo Dominguez Street  208
CAS   ae  Pan ma
Te   50
Fax   50
Eml  panambo@owbunker net

Reg NR 1-583   05 S01

# **EXHIBIT 4**

# OW BUNKER GROUP

## Terms and Conditions of sale for Marine Bunkers
## Edition 2013

**A.**      **GENERAL INTRODUCTION**

A 1      This is a statement of the terms and conditions according to which the International O W Bunker Group (hereinafter called "OWB") will sell marine bunkers

A 2      These conditions apply to all offers quotations, orders agreements, services and all subsequent contracts of whatever nature, except where otherwise is expressly agreed in writing by OWB

A 3      General trading conditions of another party will not apply unless expressly accepted in writing by OWB

A 4      In the case that, for whatever reason, one or more of the (sub)clauses of these general conditions are invalid the other (sub)clauses hereof shall remain valid and be binding upon the parties

**B.**      **DEFINITIONS**

B 1      Throughout this document the following definitions shall apply

| | |
|---|---|
| "Seller" | means OWB, any office, branch office, affiliate or associate of the OWB Group, being the legal entity within the OWB Group whose name is included in the Order Confirmation, sent to the Buyer |
| "Buyer" | means the vessel supplied and jointly and severally her Master Owners Managers/Operators, Disponent Owners Time Charterers, Bareboat Charterers and Charterers or any party requesting offers or quotations for or ordering Bunkers and/or Services and any party on whose behalf the said offers quotations orders and subsequent agreements or contracts have been made |
| "Bunkers" | means the commercial grades of bunker oils as generally offered to the Seller's customers for similar use at the time and place of delivery and/or services connected thereto |
| Owner" | means the registered Owner Manager or Bareboat Charterer of the vessel |
| "Vessel" | means the Buyer's Vessel Ship Barge or Off Shore Unit that receives the supply/bunkers either as end user or as transfer unit to a third party |
| 'Nomination' | means the written request/requirement by the Buyer to the Seller for the supply of the Bunkers |
| Order Confirmation | means the written confirmation as issued by the Seller and forwarded to the Buyer to conclude the conclusion of the negotiated sale/purchase of the Bunkers In case of conflict between the Nomination and the Order Confirmation unless the Seller otherwise agrees in writing the wording and content of the Order Confirmation is deemed contain the prevailing terms of the Agreement |
| 'Agreement | means the concluded terms for the sale/purchase of the Bunkers |
| ''Supplier ' | means any party instructed by or on behalf of the Seller to supply or deliver the Bunkers |
| 'GTC ' | means these General Terms and Conditions which shall govern the contractual regulations between the Seller and the Buyer |
| ''BDR'' | means the Bunker Delivery Receipt being the document(s) which is/are signed by the Buyer's representative(s) at the place of the supply of the Bunkers to the Vessel evidencing the quality and quantity of the Bunkers supplied to and received by the Vessel |

**C.**      **OFFERS, QUOTATIONS AND PRICES**

C 1      An Agreement shall only be concluded and binding on the Seller when the Seller sends the Order Confirmation to the Buyer Each Order Confirmation shall incorporate these GTC by reference so that the GTC are considered a part of the Confirmation

C 2      Agreements entered into via brokers or any other authorised representative on behalf of the Seller shall only bind the Seller upon the Sellers' broker or other authorised representative sending the Order Confirmation to the Buyer or the Buyer's broker as the case may be

C 3      The Seller's offer is based on the applicable taxes, duties costs charges and price level of components for Bunkers existing at the time of the conclusion of the Agreement Any later or additional tax assessment duty or other charge of whatever nature and however named or any increase of components for Bunkers or any additional costs borne by the Seller whatsoever caused by any change in the Seller's contemplated source of supply or otherwise coming into existence after the Agreement has been concluded shall be added to the agreed purchase price provided that the Seller shall give

the Buyer prior notice of this effect within a reasonable (under the prevailing circumstances) time after the Seller becoming aware of the relevant circumstances

C.4     All prices and/or tariffs are exclusive VAT, unless specifically stated otherwise. Any VAT or other charge and/or tax applicable and whenever imposed, shall be promptly paid by the Buyer, and unless otherwise agreed in writing all supplies are quoted and invoiced based on quantity calculated quantity in metric tons in vacuum.

C.5     If the party requesting Bunkers is not the Owner of the Vessel, the Seller shall have the right (but will not be obliged) to insist as a precondition of sale that a payment guarantee is provided by the Owner. The Seller shall have the right (but will not be obliged) to cancel any agreement with the Buyer at any time, if such payment guarantee is not received upon request thereof from the Seller to the Owner. The Seller's decision to forego obtaining a payment guarantee under this Clause C.5 shall have no effect on Seller's right to a lien on the Vessel for any Bunkers supplied under this Agreement.

C.6     The Buyer warrants that it is authorized as agent to order Bunkers for the Vessel, and that the Seller has a lien on the Vessel for any Bunkers supplied under this Agreement. If the party requesting Bunkers is not the Owner of the Vessel, Buyer assumes the sole responsibility for communicating the terms and conditions of this Agreement to the Owner of the Vessel prior to the date of delivery.

C.7     If at any time before the delivery the financial standing of the Buyer appears to the Seller (in its absolute discretion) to have become impaired or unsatisfactory, the Seller may require cash payment or security to be provided by the Buyer prior to delivery, failing which the Seller may cancel the delivery without any liability on the part of the latter or its subcontractors.


## D.     SPECIFICATIONS (QUALITY – QUANTITY)

D 1     The Buyer assumes the sole responsibility for the choice of nominating the quantity and quality of Bunkers and determine (if applicable) potential compatibility with any Bunkers already on board the Vessel  The Buyer also assumes sole responsibility for the selection and fitness of its choice of Bunkers for any particular use or purpose, and the Seller shall assume no responsibility whatsoever for the compliance or fitness of the Bunkers for a specific type of engine or equipment which the Buyer may or may not have agreed upon in any C/P (Charterparty) term or otherwise  This includes but is not limited to the quality sulphur content and any other specific characteristics of the Bunkers whatsoever  Any and all warranties regarding the satisfactory quality, merchantability, fitness for purpose  description or otherwise  are hereby excluded and disclaimed
Where specifications designate a maximum value, no minimum value is guaranteed unless expressly stated in the Order Confirmation  and conversely where minimum values are provided in a specification, no maximum values are guaranteed unless expressly stated in the Order Confirmation

D 2     The quality and quantity shall be as agreed between the Seller and the Buyer and shall correspond to the Seller's Order Confirmation  Unless otherwise agreed in writing the Bunkers are delivered and sold based on metric tons in vacuum

D 3     Where standard specifications are being given or referred to, tolerances in accordance with ISO 4259 in respect of Reproducibility/Repeatability in quality are to be accepted without compensation or other consequences whatsoever

D 4     In respect of the quantity agreed upon the Seller shall be at liberty to provide  and the Buyer shall accept a variation of 5% from the agreed quantity, with no other consequence than a similar variation to the corresponding invoice from the Seller

D 5     Information regarding the typical characteristics of the Bunkers at any delivery location shall only be indicative of the Bunkers that have been made available at that location and shall not form a part of the specification of the Bunkers to be delivered  All grades of produce may contain petroleum industry allowed bio-derived components


## E.     MEASUREMENTS – NON CLAUSING OF THE BDR(S)

E.1     The quantities of bunkers shall be determined only from the official gauge or meter of the bunkering barge, tank truck or of the shore tank in case of delivery ex wharf.

E.2     The Buyer's representative shall together with the Seller's representative measure and verify the quantities of Bunkers delivered from the tank(s) from which the delivery is made. When supplied by bunkering barge/tanker the particular barge/tanker will present its tank calibration and ullage sounding records, which are agreed to be the sole valid and binding document(s) to determine the quantity or quantities supplied. Quantities calculated from the Receiving Vessel's soundings shall not be considered.

E.3 Should the Buyer's representative fail or decline to verify the quantities, the measurements of quantities made by the Seller or the Supplier shall be final, conclusive and binding and the Buyer shall be deemed to have waived any and all claims in regard to any variance.

E.4 The Buyer expressly undertakes not to make any endorsement, complaint/ comment (including but without limitation any ''No-lien'' clausing) on the BDR when presented for signature by the Buyer's representative(s), any such insertion shall be invalid and of no effect whatsoever.

E.5 In the event of complaint/comment on the quantity of Bunkers delivered, the Buyer or the Master of the Vessel shall give to the Seller/Supplier a letter of protest separately, followed by a complaint in detail to the Seller, setting out the exact quantity(ies) claimed shortsupplied, and with full supporting vouchers, in writing within 7 (seven) days thereof, failing which, any such claim by the Buyer shall be extinguished as non existent, and the Buyer shall be deemed to have expressly waived any such claim against the Seller/Supplier, the relevant claim being time barred, and the Seller/Supplier's weight and measurements shall be conclusive evidence of the quantity of Bunkers delivered.

## F.     SAMPLING

F.1 The Supplier shall arrange for four (4) representative samples of each grade of Bunkers to be drawn throughout the entire bunkering operation. The Buyer's representative has the responsibility to witness that such samples are drawn  correctly and shall confirm his witnessing thereof and also confirm the proper and correct sealing by signing the labels of the sample bottles.

F.2 In case that dripsampling is not available onboard the barge, tanktruck or shore tank, samples shall be taken as a composite of each tank from which supplies are made, onboard the barge (respectively at the shore tank or tanktruck), divided with 1/3 from each the top, mid and bottom of the tanks.

F.3 The samples shall be securely sealed and provided with labels showing the Vessel's name, identity of delivery facility, product name, delivery date and place and seal number, authenticated with the Vessel's stamp and signed by the Seller's representative and the Master of the Vessel or his representative. The seal numbers shall be inserted into the BDR/Bunker Delivery Receipts, and by signing the BDR both parties agrees to the fact that the samples referred to therein are deemed valid and taken in accordance with the requirements as specified in this Chapter F.

F.4 Two (2) samples shall be retained by the Seller for ninety (90) days after delivery of the Bunkers, or if requested by the Buyer in writing, for as long as the Buyer reasonably required. The other two (2) samples shall be retained by the receiving Vessel, one of which being dedicated as the MARPOL sample.

F.5 In the event of a dispute in regard to the quality of the Bunkers delivered, the samples drawn pursuant to this Chapter F, shall be conclusive and final evidence of the quality of the Bunkers delivered. One, and only one, of the samples retained by the Sellers shall be forwarded to an independent laboratory to perform a set of tests, the result of which is to be made available to both parties. Those test results shall be final and binding upon both Buyer and Seller as to the parameters tested. The parties are to use best endeavours to agree the independent laboratory to perform the tests. If, however, no agreement can be reached on the choice of laboratory within 3 days of the Buyer being advised of the Seller opting to have the sample tested, the Seller is at liberty to send the sample to a reputable and independent laboratory of its choice for the tests to be conducted, and those test result will be final and binding upon Buyer and Seller as set out above.

F.6 The seal must be breached only in presence of both parties unless one/both in writing have declared that they will not be present, or fails to be present at the appropriate time and place; and both parties shall have the right to appoint independent person(s) or surveyor(s) to witness the seal breaking.

F.7 No samples subsequently taken shall be allowed as (additional) evidence. If any of the seals have been removed or tampered with by an unauthorised person, such sample(s) shall be deemed to have no value as evidence.

F.8 Any eventual samples drawn by Buyer's personnel either during bunkering or at any later date after bunkering shall not be valid as indicator of the quality supplied. The fact that such samples may eventually bear the signature of personnel on board the barge or tank truck or other delivery conveyance shall have no legal significance as such local personnel have no authority to bind Seller to different contractual terms. Seller shall have no liability for claims arising in circumstances where Buyer may have commingled the products on board the Vessel with other fuels.

## G. DELIVERY

G 1    The time of delivery  as given by the Seller  has been given as an approximate time  unless it has been otherwise specifically agreed in writing between the parties

G 2    The time of delivery will only be binding upon the Seller when all information necessary for the Seller to comply with its obligations hereunder  have been properly delivered to the Seller in reasonable time before the delivery  In the event the Nomination addresses a spread of dates for delivery  the Seller has the sole discretion to commence the delivery within any time  day/night/sshinc of these dates  always subject to the circumstances set out below in Clause G 3

G 3    The Vessel shall under all circumstances be bunkered as promptly as the prevailing circumstances permit having regard to congestion affecting the delivery facilities of Seller  its Suppliers or Agents and to prior commitments of barges or other delivery means  The Seller and/or the Supplier shall not be liable for any consequences or any time lost due to the Vessel having to wait for berth for bunkering or for completion of bunkering  and unless otherwise agreed in writing  the Seller shall not be obligated to deliver prior to the nominated date or spread of dates  The Seller is not responsible for delays caused by local customs pilots  port- or other authorities

G 4    In any case the Buyer  unless otherwise agreed in writing  must give not less than 72 (seventy two) hours approximate notice of readiness of the Vessel for delivery  which is to be followed by 48 (forty eight) hours and 24 (twenty four) hours  such notices  where the last notice must also specify the exact place of delivery  All these notices must be given to the Sellers and the Seller's representatives/agents in writing

G 5    The Seller shall be entitled to deliver the Bunkers by separate part deliveries  in which case each part delivery shall be construed as a separate delivery

G 6    The Seller shall not be required to deliver any Bunkers if any customs and/or other government permit required for such purpose has not been obtained in due time before the delivery

G 7    If the Seller at any time for any reason believes that there may be a shortage of supply at any place and that as a result thereof it may be unable to meet the demands of all its customers  the Seller may allocate its available and anticipated quantity/ies of Bunkers among its customers in such a manner as it may determine appropriate in its sole discretion

G 8    The Vessel shall be accessible at all times to Seller and Supplier and shall be bunkered as promptly as the circumstances permit  The Seller and/or the Supplier shall not be liable for any demurrage paid or incurred by the Buyer or for any loss  damage or delay of the Vessel (consequential and/or liquidating damages included) of any nature whatsoever due to congestion at the loading terminal  prior commitments of available barges or tank trucks or any other reason

G 9    The Buyer shall ensure that the Vessel provides a free  safe and always afloat and accessible side for the delivery of bunkers and that all necessary assistance as required by the Seller or the Seller s representative is rendered in connection with the delivery  If in the Supplier s opinion clear and safe berth is unavailable  delivery might be delayed or  in Seller s option  cancelled and all costs related to above will be on account of the Buyer

G 10   The Vessel shall moor  unmoor  hoist and lower bunkering hose(s) from the barge(s) whenever required by the Seller  Seller s representative or Supplier  free of expenses and in any way as may be requested to assist the barge equipment to a smooth supply  The Buyer shall make and be responsible for all connections and disconnections between the delivery hose(s) and the Vessel s bunker intake manifold/pipe and ensure that the hose(s) are properly secured to the Vessel s manifold prior to commencement of delivery
During bunkering the Vessel's scuppers must be safely blocked  which blocking must be made by the Vessel's own crew  Furthermore the Vessel must ensure that all pipes and manifolds and receiving tanks are properly checked and ready to receive the bunkers  including but not limited to ensuring proper opening/closing of relevant valves  without any risk for spillages  etc  during the bunkering
Local further special requirements for receiving bunkers must be followed strictly by the Vessel  whether advised or not by the Seller or the Seller s representative  as it is always the Vessel and the Buyer who remains solely responsible for the knowledge and awareness of such eventual additional requirements for safety reasons

G 11   In the event that the Vessel is not able to receive the delivery promptly  the Buyer is thereby in default and shall pay damages and/or any reasonable demurrage claim to the barging/supplying facilities and shall indemnify the Seller in each and every respect as a result thereof

G 12   Delivery shall be deemed completed and all risk and liabilities  including loss  damage  deterioration depreciation  contamination  evaporation or shrinkage to the Bunkers delivered and responsibility for loss  damage and harm caused by pollution or in any other manner to third parties shall pass to the Buyer

from the time the Bunkers reach the flange/connecting pipe line(s)/delivery hoses provided by the Seller on the barge/ tank truck/shore tank

G 13    If the Buyer for whatever reason is unable or refuses to receive the full quantity ordered  the Seller shall have the right to invoice the Buyer for the loss incurred by having to transport the undelivered Bunkers back to the storage or by having to sell the Bunkers in a degraded form or at a lower price  The Seller may exercise this right without prejudice to the Seller's other rights for damages or otherwise pursuant to these conditions

G 14    The Vessel shall provide and have appropriate and segregated tanks to receive the contracted quantity of Bunkers  and the Vessel shall always be able to perform its own blending on board if any blending is deemed to be required by the Buyer  The Vessel shall upon delivery test the Bunkers supplied by running her engines or auxiliaries or equipment  for which the Bunkers are supplied  for a minimum of 1 (one) hour to determine that the Bunkers are satisfactory  In the event the Bunkers are not considered satisfactory the Seller and Supplier are to be notified in writing immediately after such test period has expired  Otherwise  it shall be deemed that the Bunkers were satisfactory and that in any event the Buyer has waived any right to claim in this regard

G 15    If delivery is required outside normal business hours or on local weekends  Saturday  Sunday  national religious or public holidays the extra expenses incidental to such delivery shall be reimbursed by the Buyer as additional costs

G 16    In the event the Bunker delivery is made by vessel or barge as a ship-to-ship transfer  any damage caused by contact and/or collision and/or swell and/or other weather or sea related condition or incident  is to be dealt with by the Owners directly with the owners of the units involved  and Seller/Supplier shall not be held nor be responsible for any such damages  If  however  any of the involved units choose to pursue Seller and/or Supplier  Buyer will fully indemnify and hold Seller harmless in relation thereto

G 17    For safety reasons it is agreed that it is solely the Master of the bunkering barge that determines whether mooring alongside is safe  taking weather  swell and forecasts into consideration  Supplier/Seller not to be held responsible for any delays  demurrages  liquidating damages or similar whatsoever as a result of any eventual delays caused by any decision by the Master of the barge in this connection  Supplies being always performed weather permitting

G 18    Without prejudice to any other article(s) herein  any and all supply/ies will be based on as per best endeavours only if the receiving Vessel arrives outside the originally agreed time split as per the Order Confirmation forwarded


H       TITLE

H 1     Title in and to the Bunkers delivered and/or property rights in and to such Bunkers shall remain vested in the Seller until full payment has been received by the Seller of all amounts due in connection with the respective delivery  The provisions in this section are without prejudice to such other rights as the Seller may have under the laws of the governing jurisdiction against the Buyer or the Vessel in the event of non payment

H 2     Until full payment of the full amount due to the Seller has been made and subject to Article G 14 hereof the Buyer agreed that it is in possession of the Bunkers solely as Bailee for the Seller and shall not be entitled to use the Bunkers other than for the propulsion of the Vessel  nor mix  blend  sell  encumber  pledge  alienate  or surrender the Bunkers to any third party or other Vessel

H 3     In case of non or short payment for the Bunkers by the Buyer  the Seller is entitled (but not obliged) to repossess the Bunkers without prior juridical intervention  without prejudice to all other rights or remedies available to the Seller

H 4     In the event that the Bunkers have been mixed with other bunkers on board the Vessel  the Seller shall have the right to trace its proprietary interest in the Bunkers into the mixed bunkers and/or a right of lien to such part of the mixed bunkers as corresponds to the quantity or net value of the Bunkers delivered

H 5     The provisions of this Chapter H do not prejudice or in any way limit the Seller s right to arrest/attach the Vessel and/or sister ship and/or any sister or associate ship and/or other assets of the Buyer (or the Owner of the Vessel or any other party liable)  wherever situated in the world  without prior notice

H 6     Where  notwithstanding these conditions  title in and to the Bunkers delivered has passed to the Buyer and/or any third party before full payment has been made to the Seller  the Buyer shall grant a pledge over such Bunkers to the Seller  The Buyer shall furthermore grant a pledge over any other Bunkers present in the respective Vessel  including any mixtures of the delivered Bunkers and other bunkers  Such pledge

will be deemed to have been given for any and all claims, of whatever origin and of whatever nature that the Seller may have against the Buyer.

H.7     For the avoidance of doubt, where a mortgagee bank enforces any rights against the Vessel and becomes a mortgagee in possession of the Bunkers then as bailee the mortgage bank is liable to the Seller for fulfilment of the Agreement.


**I.       PAYMENT – MARITIME LIEN**

I.1     Payment for the Bunkers and/or the relevant services and/or charges shall be made by the Buyer as directed by the Seller within the period agreed in writing.

I.2     Payment shall be made in full, without any set-off, counterclaim, deduction and/or discount free of bank charges to the bank account indicated by the Seller on the respective invoice(s).

I.3     (i) If at any time after delivery but before the due date the financial standing of the Buyer appears to the Seller (in its sole discretion) to have become impaired or unsatisfying, the Seller may require immediate full payment of all its invoices due and/or those not yet due, or such security as it shall deem to be satisfactory.
(ii) In the event that the Buyer shall default in making any payment due, the Seller may suspend deliveries of Bunkers until such payment has been made in full (together with default/delay compensation and costs), or the Seller may, in its discretion, elect to treat such default as a serious breach of the Agreement and thereupon terminate the Agreement on whole or in part without prejudice to any claim against the Buyer for damages, including cancellation charges. Such termination or suspension shall not relieve the Buyer of any obligation undertaken by virtue of an Agreement so terminated.
(iii) Where the Seller has extended any kind of credit facility to a group of companies or associated companies, default by any one relevant Buyer in respect to any invoice of the Seller shall give the right to the Seller to cancel all credit arrangements of the entire group or of all the associates, whereupon sub-clauses I.3.(i) and I.3.(ii) shall apply as appropriate.
(iv) Where the Buyer fails to pay timely, the Seller has the right to (without prejudice to its rights to receive default/delay compensation) take all appropriate steps to secure and enforce its claim; the Seller may also unilaterally cancel any credit arrangements agreed with/extended to the Buyer.
(v) All judicial and extrajudicial costs and expenses, including pre-action costs, fees, expenses and disbursements of the Seller's lawyers/attorneys-at-law, incurred in connection with non payment or delayed payment or by any other breach by the Buyer of these conditions, shall be for the Buyer's account, immediately payable by the latter to the Seller. In case of litigation, the Buyers shall also pay all the relevant expenses to the Seller, including but without limitation all his reasonable attorneys/lawyers' fees, costs and disbursements.

I.4     Payment shall be deemed to have been made on the date of which the Seller has received the full payment and such is available to the Seller. If payment falls due on a non-business day, the payment shall be made on or before the business day nearest to the due date. If the preceding and the succeeding business days are equally near to the due date, then payment shall be made on or before the preceding business day.

I.5     Any delay in payment of the full sum due shall entitle the Seller to interest at the rate of 3 (three) per cent per month (compounded monthly for each month [or part thereof] of non payment) without prejudice to any rights or remedies available to the Seller. Furthermore the Seller is entitled to charge a delayed payment administration fee of USD 1.50 per mton supplied, or the equivalent thereof in local currency, with a minimum administration fee of USD 350.00 for each delivery made. All reasonable attorneys' fees incurred by Seller in connection with the collection of overdue payments shall be for the sole account of the Buyer.

I.6     Payments made by the Buyer in respect of a supply of Bunkers shall at all times be credited in the following order: (1) costs of any kind or nature, including but not limited to legal costs and attorneys' fees, (2) interest and administrational fee, and (3) invoices in their order of age, also if not yet due, or in Seller's sole discretion to specify a payment to any such invoice Seller considers relevant.

I.7     All costs borne by the Seller in connection with the collection of overdue payments, including those of the Seller's own legal and credit department and, including but not limited to, reasonable attorneys' fees, whether made in or out of court and in general all costs in connection with breach of any agreement by the Buyer, including but not limited to reasonable attorneys' fees, shall be for the sole account of the Buyer.

I.8     The Seller shall at all times, in its absolute discretion, be entitled to require the Buyer to provide the Seller what the Seller deems to be proper security for the performance of all of Buyer's obligations under the Agreement. Failing the immediate provision of such security upon Seller's demand, the Seller shall be

entitled to stop any further execution of any agreement(s) between the parties until such time as the Buyer has provided the required security.

I.9     Where Bunkers are supplied to a Vessel, in addition to any other security, the Agreement is entered into and the Goods are supplied upon the faith and credit of the Vessel It is agreed and acknowledged that the sale of Bunkers to the Buyer and/or their acceptance on the Vessel create a maritime lien over the Vessel for the price of the Bunkers (and all interest and costs payable in respect thereof; including but not limited to the reasonable attorney's fees), such maritime lien afforded to the Seller over the Vessel. In any event any applicable Law shall not prejudice the right of the maritime lien of the Seller afforded hereunder or by any other applicable Law, be it of the place of delivery, or the flag of the Vessel, or the place of jurisdiction and/or an arrest of the Vessel, or otherwise howsoever.

I.10    It is mutually agreed that the Bunkers provided by the Seller to the Buyer under the terms of this Agreement have been ordered by the Buyer in the ordinary course of business between Seller and Buyer. All payments from Buyer to Seller for Bunkers supplied under this Agreement are deemed to have been made in the ordinary course of business between Seller and Buyer, according to these ordinary business terms agreed between them.


**J.      CLAIMS**

J.1     In addition to the obligations referred to in Article E.4 and E.5 herein, any claim in connection with the quantity of the Bunkers delivered must be notified by the Buyer, or the Master of the Vessel, to the Seller or Supplier immediately after completion of delivery in the form of a letter of protest If the Buyer or the Vessel's Master fails to present such immediate notice of protest to the Seller or Supplier, such claim shall be deemed to have been waived and shall be absolutely barred for all purposes

J 2     Always without prejudice to Article G 14 herein, any and all claims concerning the quality of the Bunkers delivered or time consumed for the entire operation, shall be submitted to the Seller in writing within 15 (fifteen) days after delivery with a clear statement as to the nature or the claim(s) along with appropriate supporting documentation  failing which any rights to complain or claim compensation of whatever nature shall be deemed to have been waived and absolutely barred for all purposes

J 3     The Buyer shall be obliged to make payment in full and fulfil all other obligations in accordance with the terms of the Agreement and these conditions  whether or not it has any claims or complaints  If Buyer submits a claim against Seller with respect to the quality or quantity of the products supplied  the Seller or the Seller's nominated representative shall be entitled to board the Vessel and investigate the Vessel's records, log books, engine logs  etc  and to make copies of any such document the Seller or the Seller s nominated representative may consider necessary for its investigations connected to the case  The Buyer shall allow this, or where Buyer has chartered the Vessel then the Buyer shall obtain authorization from Owner to allow the herein stated steps and to provide full assistance and support by the Vessel's officers and crew in any such manner the Seller or Seller's nominated representative may require  Failure to allow boarding and/or to produce required copies of documents and/or lack of full cooperation by the Vessel's officers and crew shall constitute a waiver of the Buyer's claim

J 4     The Seller shall be allowed, and the Buyer  Owner, Officers and Crew onboard the receiving Vessel shall agree and in any way support and cooperate with Seller's representative, to draw samples from the Vessel's storage tanks, settling tanks and service tank and/or from before and after the Vessel's centrifuges to have extra tests carried out for such samples at independent laboratory

J 5     In each and  every case, any and all claims of the Buyer shall be timebarred unless arbitration/legal proceedings have been commenced/issued at the competent tribunal/court set forth in Chapter P hereof and served within 12 (twelve) months from the date of delivery of the Bunkers, or the date that delivery should have commenced pursuant to the Order Confirmation from the Seller


**K.      LIABILITY – LIMIT TO SELLER'S LIABILITY**

K 1     The Seller and/or Supplier shall not be liable for damages of whatever nature, including physical injury, nor for delay of delivery of Bunkers or services, no matter whether such damages or delay have been caused by fault or negligence on the side of the Seller. The Seller shall furthermore not be liable for damages or delay as described above when such damages or delay have been caused by the fault or negligence of its personnel, representatives, Supplier or (sub)contractors

K 2     Liabilities of the Seller for consequential and/or liquidated damages including but not limited to loss of time, loss of cargo or charter cancelling date, loss of income or profit/earnings, are excluded  In any event and notwithstanding anything to the contrary herein, liability of the Seller shall under no

circumstances exceed the invoice value of the Bunkers supplied under the relevant agreement to the relevant Vessel

K 3     The Buyer shall be liable towards the Seller and herewith undertakes to indemnify the Seller for any and all damages and/or costs suffered or otherwise incurred on the Seller due to a breach of contract and/or fault or neglect of the Buyers its Supplier agents Servants (sub)contractors representatives employees and the officers crews and/or other people whether or not on board of the Vessel(s) The Buyer furthermore undertakes to hold the Seller harmless in case of any third party institutes a claim of whatever kind against the Seller whether direct or indirect relation to any agreement regulated by these terms and conditions Third party shall mean any other (physical or legal) person/company than the Buyer

K 4     No servant supplier or agent of the Seller/Supplier (including independent (sub)contractors from time to time employed by the Seller/Supplier) shall be liable to the Buyer for loss damage or delay while acting in the course of or in connection with its employment and/or agency for the Seller Without prejudice to the above every exemption limitation condition and liberty herein contained and every right exemption from or limit to liability defence or immunity of whatever nature applicable to the Seller or to which it is entitled hereunder shall also be available and shall extend to protect every such servant representative or agent of the Seller and/or the Supplier acting as aforesaid

## L.    EXEMPTIONS AND FORCE MAJEURE

L 1     Neither the Seller nor the Seller's Supplier shall be liable for any loss claim damage delay or demurrage due to any delay or failure in their performance under this Agreement (a) by reason of compliance with any order or request of any government authority or person purporting to act therefore or (b) when supply of the Bunkers or any facility of production manufacture storage transportation distribution or delivery contemplated by the Seller or Supplier is interrupted delayed by congestion or other event (also see Article G 3 above) or by unavailability of product and/or barge equipment or by inadequate resource for any cause whatsoever which interruption delay unavailability or inadequate resources is not within the immediate control of the Seller or the Supplier including (without limitation) if such is caused wholly or partly by labour disputes strikes stoppages lock out governmental intervention wars civil commotion riot quarantine fire flood earthquake accident storm swell ice adverse weather or any act of God Neither the Seller nor the Supplier shall be required to remove any such cause or replace any affected source or supply or facility if doing so shall involve additional expense or a deviation from the Seller s or the Supplier s normal practices Neither the Seller nor the Supplier shall be required to make any deliveries which fail in whole or in part as a result of the causes set out in this Article at any later time

L 2     If the Buyer exercises reasonable diligence the Buyer shall not be liable for failure to receive any particular delivery if prevented therefrom by force majeure The Buyer shall indemnify the Seller or the Seller s supplier for any damage caused by the Buyer the Buyer's agent or employees in connection with deliveries hereunder

L 3     Declaration of Force Majeure shall be given without unduly delay once such event(s) have come to the knowledge of the respective party declaring same However under no circumstances and for no reason whatsoever can Force Majeure entitle the Buyer not to pay promptly any invoice of the Seller

L 3     In the event that the Seller as a result of force majeure can only deliver a superior grade of bunkers the Seller is entitled to offer the said grade and the Buyer must accept delivery thereof and pay the applicable price

L 4     (a)    These Terms and Conditions are subject to variation in circumstances where the physical supply of the Bunkers is being undertaken by a third party which insists that the Buyer is also bound by its own terms and conditions In such circumstances these Terms and Conditions shall be varied accordingly and the Buyer shall be deemed to have read and accepted the terms and conditions imposed by the said third party

          (b)    Without prejudice or limitation to the generality of the foregoing in the event that the third party terms include

          (i)    A shorter time limit for the doing of any act or the making of any claim then such shorter time limit shall be incorporated into these terms and conditions

          (ii)    Any additional exclusion of liability clause then same shall be incorporated mutatis mutandis into these

          (iii)    A different law and/or forum selection for disputes to be determined then such law selection and/or forum shall be incorporated into these terms and conditions

(c)   It is acknowledged and agreed that the buyer shall not have any rights against the Seller which are greater or more extensive than the rights of the supplier against the aforesaid Third Party

## M.       BREACH/CANCELLATION

M 1       Without prejudice to any other remedies and rights, the Seller shall have the option immediately to cancel the Agreement in full or in part, or to store or procure the storage of the Bunkers, in whole or in part, for the account and risk of the Buyer and to charge the Buyer the expenses thereby incurred, or to hold the Buyer fully to the agreement, or take any other measures which the Seller deems appropriate, without prejudice to its rights of indemnification, without any liability on the side of the Seller, in any one of (but not limited to) the following cases

a)            when the Buyer, for whatever reason, fails to accept the Bunkers in part or in full at the place and time designated for delivery

b)            when the Buyer fails in part or in full to comply with its obligations to pay any amount due to the Seller and/or provide security as set out in these GTC,

c)            when, before the date of delivery, it is apparent in the opinion of the Seller that the financial position of the Buyer entails a risk to the Seller,

d)            when, in case of force majeure, the Seller is of the opinion that the execution of the agreement should be cancelled

M 2       The Seller may terminate any Agreement with the Buyer in whole or in part  in its full discretion  upon the breach of any provisions hereof by the Buyer or in the event that the Buyer fails to make or suspends payment  ceases to carry on business  makes an arrangement with its creditors or undergoes any form of bankruptcy  administration  re-organisation or asset rearrangement

M 3       The Seller has the option to immediately cancel the Agreement for the account and risk of the Buyer if at any time the Seller  in its sole discretion  has reasonable grounds to believe that

a)            The Vessel  or

b)            The Charterer of the Vessel  or

c)            The fully or partly Owner(s) of the Vessel  or

d)            Any officers of the Vessel  or

e)            The Operator and/or Manager of the Vessel  or

f)            Any other person or entity in any way related to the Agreement or delivery is/are

1)    Iranian(s)  or

2)    Related in any way to Iran or Iranians  or

3)    Listed on the US OFAC Specially Designated Nationals List  or

4)    Covered by any US  UN- and/or EU sanctions  or

5)    Covered by any sanctions of any other jurisdiction and/or administration

Under no circumstances can the Seller be held liable for any loss  delays  claims or damages of whatever kind suffered by the Buyer due to a cancellation under this Article

The Buyer must inform the Seller immediately the Buyer becomes aware of or has reasons to believe that any of the above items a) to f) in combination with any of the above items 1) to 5) are fulfilled/apply

Should the Buyer breach its obligation to inform the Seller  the Buyer shall fully indemnify and keep the Seller harmless for any damage or loss caused by such breach  including consequential or liquidated damages

M 4       The Buyer acknowledges that any agreements with the Seller and any actions related to such agreements as well as any interaction with third parties related to such agreements are covered by certain anticorruption laws and regulations which can include any anticorruption law  including but not limited to the U S  Foreign Corrupt Practices Act ('FCPA") and the UK Bribery Act  Therefore  the Buyer declare to comply with all applicable anticorruption laws and regulations and agrees that the Buyer has not  and will not  offer  promise, pay, or authorize the payment of any money or anything of value  or take any action in furtherance of such a payment  whether by direct or indirect means  to any public official or private individual to influence the decision of such person in the performance of his duties to a government or to his company  Any breach of this clause will void the related Agreement and in the sole discretion of the Buyer any other Agreement between the parties  making any claims for payment  delivery or any other obligation of the Seller under this Agreement void  The Buyer is liable for all and any costs or losses incurred by the Seller due to such breach and/or an Agreement becoming void as a consequence

## N.       SPILLAGE, ENVIRONMENTAL PROTECTION

N 1       If a spill occurs while the Bunkers are being delivered  the Buyer shall promptly take such action as is necessary to remove the spilled Bunkers and mitigate the effects of such spill  Without prejudice to the

generality of the foregoing the Seller is hereby authorised by the Buyer in the absolute discretion of the Seller but at the expense of the Buyer to take such measures and incur such expenses (whether by employing its own resources or by contraction with others) as are necessary in the judgment of the Seller to remove the spilled Bunkers and mitigate the effects of such spill The Buyer shall cooperate and render such assistance as is required by the Seller in the course of the action All expenses, claims costs losses damages liability and penalties arising from spills shall be borne by the party that caused the spill by a negligent act or omission If both parties have acted negligently all expenses claims losses damages liability and penalties shall be divided between the parties in accordance with the respective degree of negligence The burden of proof to show the Seller's negligence shall be on the Buyer The Buyer shall give the Seller all documents and other information concerning any spill or any programme for the prevention thereof that is required by the Seller or is required by law or regulation applicable at the time and place of delivery

## O.   DELAYS AND CANCELLATIONS

O 1         Notwithstanding anything else to the contrary herein, and without prejudice to any rights or remedies otherwise available to the Seller, the Buyer by its acceptance of these conditions, expressly agrees that Seller has the sole discretion to cancel or to adjust prices in the event the Vessel is suffering a delay exceeding 24 hours from the (last) nomination date

O 2         If the Buyer for whatever reason (including circumstances entirely outside Buyer's control) cancels the Agreement where Order Confirmation has been sent by Seller the Buyer shall be liable for any and all losses suffered and liabilities incurred by the Seller and/or the Supplier as a result of such cancellation including but not limited to barge costs re-storing of the Bunkers and hedging costs and also in Seller's sole option any difference between the contract price of the undelivered product and the amount received by the Seller upon resale to another party or if another buyer cannot be found any market diminution in the value of the product as reasonably determined from available market indexes These losses and liabilities shall be indemnified by a minimum amount of USD 4 000 by way of agreed minimum liquidated damages and shall be indemnified in full if they in total exceed USD 4 000

## P   LAW AND JURISDICTION

P 1         This Agreement shall be governed and construed in accordance with English law
The 1980 United Nations Convention on Contracts for the International Sale of Goods (CISG) shall not apply
Except for circumstance referred to in Clause P 5 below all disputes arising in connection with this Agreement or any agreement relating hereto save where the Seller decides otherwise in its sole discretion shall be finally settled by arbitration in London England in accordance with the Arbitration Act 1996 (or any subsequent amendment)

P 2         In the event that the Seller determines to refer any dispute to arbitration it shall be referred to a tribunal of three arbitrators consisting of one arbitrator to be appointed by the Seller one by the Buyer and one by the two arbitrators already appointed Each member of the tribunal shall be a full member of The London Maritime Arbitrators Association (the LLMA'') Either party may call for Arbitration by service of written notice specifying the name and address of the arbitrator appointed and a brief description of the dispute(s) or difference(s) to be the subject or the Arbitration If the other party does not within 14 days serve notice of appointment of an arbitrator to arbitrate the dispute(s) or difference(s) then the first moving party shall have the right without further notice to appoint its own arbitrator as sole arbitrator and shall subsequently advise the other party accordingly The award of the sole arbitrator shall be binding on both parties as if he had been appointed by agreement   Provided each party appointed their own arbitrator then these two arbitrators shall jointly appoint the third arbitrator In the event that the two arbitrators fail to appoint a third arbitrator within twenty days of the appointment of the second arbitrator either party may apply to the English courts for the appointment of a third arbitrator
Any disputes to be referred to Arbitration are to be determined in accordance with the current LMAA terms unless the parties agree otherwise

P 3         Nothing herein shall prevent the parties agreeing in writing to vary these provisions to provide for the appointment of a sole arbitrator

P 4         In cases where neither the claim nor any counterclaim exceeds the amount of USD 100 000 (or such other sum as the parties may agree) the Arbitration shall be conducted in accordance with the LMAA Small Claims Procedure current at the time when the arbitration proceedings are commenced

P 5         The General Maritime Law of the United States shall always apply with respect to the existence of a maritime lien regardless of the country in which Seller takes legal action Seller shall be entitled to assert

its rights of lien or attachment or other rights, whether in law, in equity or otherwise, in any jurisdiction where the Vessel may be found.

Without prejudice to any other Clause herein any disputes and/or claims arising in connection with these conditions and/or any Agreement governed by them, any dispute and/or claim arisen in connection with a Vessel detained by Seller at any port, place or anchorage within the United States shall be submitted to the United States District Court for the Southern District of New York.

P.6      If any procedure of any nature whatsoever is instituted under Clause P.5 above, in connection with any controversy arising out of this Agreement or to interpret or enforce any rights under this Agreement, the prevailing party shall have the right to recover from the losing party its reasonable costs and attorneys' fees incurred in such proceeding.


**Q.       VALIDITY**

Q.1      These terms and conditions shall be valid and binding for all offers, quotations, prices and deliveries made by the O.W. Bunker Group, any associated company, representative or agent as of September 1, 2013, or at any later date.

Q.2      These terms and conditions are available at the website www.owbunker.com, on which site as well the Sellers may notify amendments, alterations, changes or verifications to same. Such amendments, alterations, changes or verifications are deemed to be a part of the entire terms once same have been advised on the website.

# EXHIBIT 5

| **From:** | Francisco Carreira <paco@carreirapitti.com> |
|---|---|
| **Sent:** | Wednesday, March 18, 2015 2:53 PM |
| **To:** | Power, James H (NYC - X73494) |
| **Cc:** | Larsen, Marie E (NYC - X73477) |
| **Subject:** | Fwd: Subject: OW Bunker Bankruptcy Outstanding Invoices for M/V Sharon Sea, M/V Dubai Attraction and M/V Orchid |
| **Attachments:** | STS with mt Sheron Sea.pdf; STS with mt Dubai Attraction.pdf; STS with mt Orchid.pdf |

dear james: following up our phone conversation few minutes ago, please be aware that i have been instructed to arrest M/V SHARON SEA, presently in Panama for the OWBP debt, we are also tracking M/V Dubai Attraction and M/V Orchid.  i wish to convey our desire to avoid doing this, in addition to the amount we are adding interest as per TAC and court costs which will increase the claim in 25-30%. OWBP has instructed me to accept payment in panama, not to accept legal actions anywhere else. i will proceed tomorrow morning unless i can inform my clients of a satisfactory agreement.

regards,

paco carreira

Francisco (Paco) Carreira-Pitti
CARREIRA PITTI ATTORNEYS
Panama, Republic of Panama
TEL: (507) 269-2444
FAX: (507) 263-8290
USA TOLL FREE 877-716-2612
MOBILE (507) 6618-7226

---------- Forwarded message ----------
From: **Francisco Carreira** <paco@carreirapitti.com>
Date: Wed, Mar 18, 2015 at 10:02 AM
Subject: Fwd: Subject: OW Bunker Bankruptcy Outstanding Invoices for M/V Sharon Sea, M/V Dubai Attraction and M/V Orchid
To: James.Power@hklaw.com

dear james:  on march 9, 2015 i answered your questions about the physical supplier in the matter of the M/V Sharon Sea, M/V Dubai Attraction and M/V Orchid.  we confirmed that the supplier was O.W. BUNKER PANAMA. i am surprised not having an answer from you.

could you please let me know the position in this matter.

regards,

paco carreira

| | |
|---|---|
| **From:** | Power, James H (NYC - X73494) |
| **Sent:** | Wednesday, March 18, 2015 6:19 PM |
| **To:** | Francisco Carreira |
| **Cc:** | adto@owbunker.com; Larsen, Marie E (NYC - X73477) |
| **Subject:** | RE: Subject: OW Bunker Bankruptcy Outstanding Invoices for M/V Sharon Sea, M/V Dubai Attraction and M/V Orchid |
| **Attachments:** | scan_03_18_2015_17_37_12_935.pdf |

Paco:

We have reviewed the files and sought guidance from our client on the Sharon Sea and have been provided a copy of an OW invoice from Ann Vestergaard. The client is preparing funds and has advised us that payment under the invoice attached requires wire transfer to an ING account. I attach a copy of that invoice. Can you explain why there has been a change in payment instructions from the original invoice? Please confirm that we can arrange payment to the ING account as per the original invoice. Also, please provide us the supporting documentation that you are authorized to act on behalf of OW Panama for the purpose of collecting monies due to OW Panama into your firm escrow account. We are doing everything in our power to avoid an arrest of the Sharon Sea which will cause unnecessary damage.

Also, we are working on putting funds together for payment of the amounts owed on the vessels Dubai Attraction and the Orchid however we have not been able to locate an invoice. Was an invoice ever issued? Please send me a copy of the invoice. I would like to arrange payment for all vessels at the same time.

Regards,
James

**James Power | Holland & Knight**
Partner
31 West 52nd Street | New York NY 10019
Phone 212.513.3494 | Fax 212.385.9010
james.power@hklaw.com | www.hklaw.com

A b l l a r d l c t h B l u r   w t t r p o t e a a h d l l e g a l n

> **From:** Francisco Carreira [mailto:paco@carreirapitti.com]
> **Sent:** Wednesday, March 18, 2015 11:02 AM
> **To:** Power, James H (NYC - X73494)
> **Subject:** Fwd: Subject: OW Bunker Bankruptcy Outstanding Invoices for M/V Sharon Sea, M/V Dubai Attraction and M/V Orchid

> dear james: on march 9, 2015 i answered your questions about the physical supplier in the matter of the M/V Sharon Sea, M/V Dubai Attraction and M/V Orchid. we confirmed that the supplier was O.W. BUNKER PANAMA. i am surprised not having an answer from you.

> could you please let me know the position in this matter.

> regards,

> paco carreira

| | |
|---|---|
| **From:** | Francisco Carreira <paco@carreirapitti.com> |
| **Sent:** | Thursday, March 19, 2015 10:03 AM |
| **To:** | Power, James H (NYC - X73494); Adrian Tolson; Larsen, Marie E (NYC - X73477) |
| **Subject:** | MV SHARON SEA, MV DUBAI ATTRACTION & MV ORCHID |
| **Attachments:** | order 183-11596 Sharon Sea.pdf; order 183-11595 Dubai Attraction.pdf; order 183-11622 Orchid.pdf |

Dear james:  I followed up our conversation with my clients.  I have been asked to pursue all reasonable and speedy solution to these issues otherwise I have to arrest the MV SHARON SEA, currently in Panama.

 this is not to put any additional pressure but M.V. SHARON SEA  is scheduled to transit the panama canal early tomorrow morning, i have to file our arrest by 5:00pm today.

please see below your paragraphs, paco Carreira

We have reviewed the files and sought guidance from our client on the Sharon Sea and have been provided a copy of an OW invoice from Ann Vestergaard.  The client is preparing funds and has advised us that payment under the invoice attached requires wire transfer to an ING account.  I attach a copy of that invoice.  Can you explain why there has been a change in payment instructions from the original invoice?  Please confirm that we can arrange payment to the ING account as per the original invoice.

**Your client has ignored the payment instructions for five months already, now when we come into the picture you inquire as to payment instructions issued before the demise of the OWB group in early November.  I have been advised that if you wish a new set of invoices can be issued with fresh payment instructions for immediate payment.**

Also, please provide us the supporting documentation that you are authorized to act on behalf of OW Panama for the purpose of collecting monies due to OW Panama into your firm escrow account.  We are doing everything in our power to avoid an arrest of the Sharon Sea which will cause unnecessary damage.

**This sounds, with all due respect, as an excuse.  I have not asked you for any evidence that you are acting on behalf of your clients.  You sent a message to Mr. Tolson, I was instructed to answer and I did it.  The document I have available is what I need in Panama, the Power of Attorney to arrest.  If there is any doubt of the standing of OWBP to pursue this claim this can only be verified in court.  You made references yesterday to PMI, Gabriel Sosa and other parties which may have debts against OWB companies, I know of one case filed in Panama, nevertheless the debts owed to OWBP are separate from any third party claims.**

 Also, we are working on putting funds together for payment of the amounts owed on the vessels Dubai Attraction and the Orchid however we have not been able to locate an invoice.  Was an invoice ever  issued?  Please send me a copy of the invoice.  I would like to arrange payment for all vessels at the same time.

I am sending copies of the invoices for all three vessels.  Again, since these were issued before the group demise, my instructions are to offer new invoices, if this is not satisfactory my instructions are to have this matter decided by courts in panama and let anyone claiming rights filing their appearance and/or claim.

**a final note, this is not to put any additional pressure but M.V. SHARON SEA  is scheduled to transit the panama canal early tomorrow morning, i have to file our arrest by 5:00pm today.**

look forward to your answer,

paco carreira


Francisco (Paco) Carreira-Pitti
CARREIRA PITTI ATTORNEYS
Panama, Republic of Panama
TEL: (507) 269-2444
FAX: (507) 263-8290
USA TOLL FREE 877-716-2612
MOBILE (507) 6618-7226

| | |
|---|---|
| **From:** | Power, James H (NYC - X73494) |
| **Sent:** | Thursday, March 19, 2015 10:44 AM |
| **To:** | Francisco Carreira; Adrian Tolson; Larsen, Marie E (NYC - X73477) |
| **Subject:** | RE: MV SHARON SEA, MV DUBAI ATTRACTION & MV ORCHID |
| | |
| **Importance:** | High |

Paco:

Thank you for the email.  We are working to resolve this issue before there is any need to arrest the vessel which will likely lead to additional costs and expenses and possible claims against OW Panama later   Before we can recommend making a payment to your trust account for amounts on the OW invoice from Ann Vestergaard for the Sharon Sea I need to clarify a statement you made yesterday.  You stated that OW Panama has assigned its receivables and the right to collect the receivables to a third party.  You did not identify that third party. To make sure there is no risk of double liability for my client for the fuel delivery to the Sharon Sea please provide me the names and contact details of the third party to who OW receivables have been assigned   I would like to reach out and contact that third party   We understand that OW (Denmark) was a 50% owner of OW Panama and as such would have a right to 50% of the receivables

I am not being difficult here.  It's just that you stated you had authority given to you by OW Panama but later stated that OW Panama assigned the receivables to a third party   I would of course need to see that you are authorized to act on behalf of OW Panama for collection purposes and not simply authorized to "arrest" vessels   There is a big difference   It is clear OW Panama is insolvent   It is understood you are winding down the company   If payment is made by my client to your escrow account and you do NOT have the legal authority to collect the money on behalf of OW Panama and/or this unidentified third party then a receiver later appointed by the court or a creditor of OW Panama may seek to receive the same payment on grounds that you were not authorized to act on behalf of OW Panama or that any assignment of receivables to a third party was void because it was done at a time OW Panama was insolvent

We truly believe these are reasonable requests for information before such large sums of money are transferred to your firm's account contrary to the original invoice   We await your further response

Regards,
James

**James Power | Holland & Knight**
Partner
31 West 52nd Street | New York NY 10019
Phone 212.513.3494 | Fax 212.385.9010
james.power@hklaw.com | www.hklaw.com

Add to address book · View professional biography

> **From:** Francisco Carreira [mailto:paco@carreirapitti.com]
> **Sent:** Thursday, March 19, 2015 10:03 AM
> **To:** Power, James H (NYC - X73494); Adrian Tolson; Larsen, Marie E (NYC - X73477)
> **Subject:** MV SHARON SEA, MV DUBAI ATTRACTION & MV ORCHID

Dear james:  I followed up our conversation with my clients.  I have been asked to pursue all reasonable and speedy solution to these issues otherwise I have to arrest the MV SHARON SEA, currently in Panama.

 this is not to put any additional pressure but M.V. SHARON SEA  is scheduled to transit the panama canal early tomorrow morning, i have to file our arrest by 5:00pm today.


please see below your paragraphs, paco Carreira


We have reviewed the files and sought guidance from our client on the Sharon Sea and have been provided a copy of an OW invoice from Ann Vestergaard.  The client is preparing funds and has advised us that payment under the invoice attached requires wire transfer to an ING account.  I attach a copy of that invoice.  Can you explain why there has been a change in payment instructions from the original invoice?  Please confirm that we can arrange payment to the ING account as per the original invoice.

**Your client has ignored the payment instructions for five months already, now when we come into the picture you inquire as to payment instructions issued before the demise of the OWB group in early November.  I have been advised that if you wish a new set of invoices can be issued with fresh payment instructions for immediate payment.**

Also, please provide us the supporting documentation that you are authorized to act on behalf of OW Panama for the purpose of collecting monies due to OW Panama into your firm escrow account.  We are doing everything in our power to avoid an arrest of the Sharon Sea which will cause unnecessary damage.

**This sounds, with all due respect, as an excuse.  I have not asked you for any evidence that you are acting on behalf of your clients.  You sent a message to Mr. Tolson, I was instructed to answer and I did it.  The document I have available is what I need in Panama, the Power of Attorney to arrest.  If there is any doubt of the standing of OWBP to pursue this claim this can only be verified in court. You made references yesterday to PMI, Gabriel Sosa and other parties which may have debts against OWB companies, I know of one case filed in Panama, nevertheless the debts owed to OWBP are separate from any third party claims.**

 Also, we are working on putting funds together for payment of the amounts owed on the vessels Dubai Attraction and the Orchid however we have not been able to locate an invoice.  Was an invoice ever  issued?  Please send me a copy of the invoice.  I would like to arrange payment for all vessels at the same time.

**I am sending copies of the invoices for all three vessels.  Again, since these were issued before the group demise, my instructions are to offer new invoices, if this is not satisfactory my instructions are to have this matter decided by courts in panama and let anyone claiming rights filing their appearance and/or claim.**


**a final note, this is not to put any additional pressure but M.V. SHARON SEA  is scheduled to transit the panama canal early tomorrow morning, i have to file our arrest by 5:00pm today.**

look forward to your answer,

paco carreira


**Francisco (Paco) Carreira-Pitti**
**CARREIRA PITTI ATTORNEYS**
**Panama, Republic of Panama**
**TEL: (507) 269-2444**
**FAX: (507) 263-8290**
**USA TOLL FREE 877-716-2612**
**MOBILE (507) 6618-7226**

# **EXHIBIT 6**

**From:**              O'Connor, Robert E. <roconnor@mmwr.com>
**Sent:**              Thursday, March 19, 2015 11:04 AM
**To:**                 Power, James H (NYC - X73494)
**Cc:**                 Larsen, Marie E (NYC - X73477)
**Subject:**          RE: M/V Sharon Sea, M/V Dubai Attraction, M/V Orchid

James,

The Debtors are searching their archives for records concerning these transactions. In the meanwhile, the Debtors reserve their rights to potentially make claims against these vessels. Furthermore, the Debtors do not object to the filing of an interpleader in the SDNY.

Kind Regards,

Bobby O'Connor



**Robert E. O'Connor** | Associate
**Montgomery McCracken Walker & Rhoads LLP**
437 Madison Avenue, 29th Floor | New York, NY 10022
Tel 212-551-7794 | Fax 212-599-1759 | roconnor@mmwr com | Attorney Profile

Notice  This email message may contain legally privileged and/or confidential information  If you are not the intended recipient(s) or the employee or agent responsible for delivery of this message to the intended recipient(s) you are hereby notified that any dissemination, distribution and/or copying of this message is strictly prohibited  If you have received this message in error, please immediately notify the sender and please immediately delete this message from your computer as well as any storage device(s)  Thank you

**From:** James.Power@hklaw.com [mailto:James.Power@hklaw.com]
**Sent:** Wednesday, March 18, 2015 6:03 PM
**To:** O'Connor, Robert E.
**Cc:** Marie.Larsen@hklaw.com
**Subject:** M/V Sharon Sea, M/V Dubai Attraction, M/V Orchid
**Importance:** High

Dear Robert:

We represent vessel/charterer interests for the above listed vessels. We have received demands for payment from a Panamanian lawyer demanding that funds be deposited into his escrow account in Panama or the vessels will be arrested. The vessels were bunkers in the Galveston Offshore Lightering Area (GOLA) and the fuel deliveries were negotiated with Keith Richardson and Ann Vestergaard both of whom working for one or more of the OW USA entities. The invoice from OW Panama directs payment to an ING account in Netherlands. Despite this instruction, I was told Adrian Tolson, former managing director of OW USA, OW Holding and OW North America authorized the change in payment instructions from the ING account to the Panamanian lawyers account. With all the potential claimants involved and the likelihood that one or more of the OW USA entities has a claim to the funds by reason of the internal contractual relationships amongst the various entities making up the  global OW organization we intend to file an interpleader action in the SDNY in order to deposit approximately $900,000 and obtain an injunction against arrest of these vessel by any named claimant.

By return email please confirm that one or more of the OW USA entities has a claim or potential claim to these funds and whether the OW USA entities consent to the filing of the interpleader in the SDNY.

Regards,
James

**James Power | Holland & Knight**
Partner
31 West 52nd Street | New York NY 10019
Phone 212.513.3494 | Fax 212.385.9010
james.power@hklaw.com | www.hklaw com

Add to address book   View professional biography

NOTE  This e-mail is from a law firm, Holland & Knight LLP ("H&K"), and is intended solely for the use of the individual(s) to whom it is addressed  If you believe you received this e-mail in error, please notify the sender immediately, delete the e-mail from your computer and do not copy or disclose it to anyone else  If you are not an existing client of H&K, do not construe anything in this e-mail to make you a client unless it contains a specific statement to that effect and do not disclose anything to H&K in reply that you expect it to hold in confidence  If you properly received this e-mail as a client, co-counsel or retained expert of H&K, you should maintain its contents in confidence in order to preserve the attorney-client or work product privilege that may be available to protect confidentiality